
**ORIGINAL**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

NOV 1 2 2008

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

| | |
|---|---|
| ROBERT S. CHANEY<br>Plaintiff, | ) <br> ) <br> ) |
| -vs- | ) |
| AIG NATIONAL UNION FIRE<br>INSURANCE COMPANY<br>OF PITTSBURGH, PA.,<br>a Pennsylvania Insurance<br>Company, | ) <br> ) <br> ) <br> ) <br> ) |
| MARSH & MCLENNAN<br>COMPANIES OF NEW YORK, NY.,<br>a New York Insurance Brokerage Company, | ) CIVIL ACTION NO._____<br>) JURY TRIAL DEMANDED<br>) |
| HARTFORD TWIN CITY FIRE INSURANCE<br>COMPANY OF HARTFORD, CT.,<br>an Indiana Insurance Company, | ) <br> ) <br> ) |
| CHUBB FEDERAL INSURANCE COMPANY<br>OF INDIANAPOLIS, IN.,<br>an Indiana Insurance Company,<br>Defendants. | ) <br> ) <br> ) <br> ) |

# 1:08-CV-3477

# -RLV

### COMPLAINT FOR VIOLATION OF
### RACKETEER INFLUENCED CORRUPT ORGANIZATION ACT ("RICO"),
### VIOLATION OF FLORIDA NOTICE STATUTE AND FOR OTHER RELIEF

COME NOW, the Plaintiff, Robert S. Chaney, former CEO of Nanovation

Technologies Inc.; and commences this action against the Defendants AIG

NATIONAL UNION FIRE INSURANCE COMPANY, MARSH & MCLENNAN

COMPANIES, HARTFORD TWIN CITY FIRE INSURANCE COMPANY and

CHUBB FEDERAL INSURANCE COMPANY ("Insurer Defendants") and brings

the following causes of action to wit:

## DEMAND FOR JURY TRIAL

Plaintiff brings this action and demands trial by jury on all counts.

I.

## THE PARTIES

1.      Defendant National Union is an insurance company incorporated under the laws of the State of Pennsylvania and has its principal place of business in New York City, New York.  National Union does business in the Northern District of Georgia as a subsidiary of American International Group (AIG).

2.      Defendant Federal is an insurance company incorporated under the laws of the State of Indiana and has its principal place of business in Indianapolis, Indiana.  Federal does business in the Northern District of Georgia as a subsidiary of the Chubb Group of Insurance Companies.

3.      Defendant Twin City is an insurance company incorporated under the laws of the State of Indiana and has its principal place of business in Hartford, Connecticut.  Twin City does business in the Northern District of Georgia as a subsidiary of the Hartford Group.

4.      Defendant Marsh & McLennan Companies is an insurance brokerage company incorporated under the laws of the State of New York and has its principal place of business in New York City, New York.  Marsh & McClennan does business in the Northern District of Georgia.

2

5.     Plaintiff Robert S. Chaney is a resident of the State of Georgia. Chaney was the Chief Executive Officer (CEO) and a member of the Board of Directors of Nanovation Technologies Inc. during the relevant time period.

## II.

## SUBJECT MATTER AND PERSONAL JURISDICTION

6.     This Court has jurisdiction over the subject matter and the Defendants in this case pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1961 *et. seq.*, specifically, 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331.  Supplemental jurisdiction applies pursuant to 28 U.S.C. § 1367 because the state law claims are so factually related to the RICO claims that they form part of the same case or controversy under Article III of the U.S. Constitution.  Alternatively, jurisdiction over the subject matter and the Defendants in this case is proper under 28 U.S.C. § 1332 as the Plaintiff and each of the Defendants are from different states and the amount in controversy exceeds $75,000.00 for the Plaintiff, exclusive of interest and costs.

## III.

## VENUE

7.     Venue is proper under 18. U.S.C. 1965(a) because the Defendants have agents and/or transact business within the meaning of 18. U.S.C. 1965(a) in this District.  Plaintiff also presently resides in, and has been a resident of, Fulton County within this District for the past 12 years.  Additionally, Atlanta,

3

GA is identified in Item 17 (Dispute Resolution Process) of the National Union Primary Policy No. 473-64-81 as 1 of the venues where the Insured can also request mediation or arbitration.

## IV.

## BASELINE BACKGROUND INFORMATION

8.      Nanovation Technologies, Inc. was a corporation incorporated under the laws of the State of Delaware with its headquarters and executive offices located at 2665 S. Bayshore Drive, suite 501, Miami, Florida during the relevant time period when Plaintiff was named CEO in July 2000, and subsequently a Director of the firm in Feb 2001, through November 2001.

9.      On July 23, 2001 at the direction (and with the assistance) of Nanovation's legal counsel Lewis Rosenbloom, Plaintiff, in his capacity as CEO, instructed Nanovation's Vice President of Finance and Treasurer, John Ofenloch Jr. ("Ofenloch"), to send a letter to Jack Gocke, an employee of Marsh USA Inc. ("Marsh"), Nanovation's insurance broker.  The clear intent of this communiqué was to provide notice of circumstances, per Clause 7 of the National Union Directors and Officers Primary Insurance Policy No. 473-64-81 purchased by Nanovation on October 8, 2000, of potential claims against Nanovation directors and officers arising by virtue of Nanovation's Chapter 11 petition to be filed 48 hours later (the "Ofenloch Letter").  The Ofenloch Letter states the following:

> Pursuant to Section 7 of the [full title of policy] we are putting you
> on notice of potential claims against the Company.  The Company
> is contemplating the filing of a Chapter 11 bankruptcy petition and

4

believe that such filing will give rise to claims being filed against the Company, its Board and Officers. We will advise you of the specifics of the claims as the Company becomes aware of them.

If you have any questions, please contact me at 734 351 0691.

10.     Nanovation indeed filed for Chapter 11 bankruptcy protection on July 25, 2001 and ultimately converted to Chapter 7 on November 20, 2001 in the United States Bankruptcy Court for the Northern District of Illinois. The bankruptcy case and estate were disposed of 6 full years later on October 16, 2007 after Trustee Barry A. Chatz made a mockery of the bankruptcy system.

11.     On or about May 7, 2002, the so called "Trustee" Chatz filed an Adversary Complaint (Adv. No. 02 A 00592) against the Plaintiff and other directors and officers of Nanovation, alleging, *inter alia*, various counts under theories of breach of fiduciary duties. The Trustee was ultimately forced to dismiss his contrived case after 6 years of misleading both Judge Ronald Barliant and Judge Pamela Hollis, while the Insurer Defendants conspired to refuse to provide for Plaintiff's defense counsel. The complaint was eventually dismissed with prejudice on October 16, 2007 and "should have never been brought" according to Judge Hollis' comments at the dismissal hearing. *See* Exhibit A, Excerpt at Pg. 31.

12.     Currently National Union's parent company, American International Group (AIG), is the poster boy for financial bailouts by the U.S. Taxpayers to the tune of $150B as of November 2008, and is currently under investigation by the Federal Bureau of Investigation (FBI) for corporate and financial fraud, including

potential fraudulent insurance products and sham financial transactions with its various subsidiaries such as National Union.  There will likely be information forthcoming from the FBI investigation that will be relevant to the Plaintiff's case.

13.    District Judge Samuel Der-Yeghiayan, of the U.S. District Court for the Northern District of Illinois, Eastern Division, on April 12, 2007, in an insurance case appeal with 7 other Nanovation directors and officers, ruled that National Union had asserted a "coverage defense", that Fla. Stat. § 627.426(2)(a) ("Florida Notice Statute") was applicable regarding directors and officers claims for defense coverage under the National Union Primary Policy No. 473-64-81 and that excess insurers Federal and Twin City would also clearly come under the Florida Notice Statute as well as "liability insurers."  *See* Exhibit B at II. Pg. 10-13, Applicability of Florida Notice Statute.

14.    As a result of Judge Der-Yeghiayan's ruling that the Florida Notice Statute was applicable and likely violated by the Insurer Defendants, National Union has recently settled other insurance claims under Primary Policy No. 473-64-81 for multiple millions of dollars in a Confidential Settlement Agreement signed on September 28, 2008 in a previous and separate lawsuit with the 7 other Nanovation directors and officers.  This confirms that indeed Primary Policy No. 473-64-81 was valid and that National Union concluded it was in breach of contract and had acted in bad faith for over 6 years, thereby also making the Federal (First Excess Layer Policy) and Twin City (Second Excess Layer Policy) valid policies as well.

6


## THE POLICIES INSURING NANOVATION'S DIRECTORS & OFFICERS

15.     At the time of the alleged acts in the Trustee's May 7, 2002

Complaint, there were in full force three separate Directors and Officers ("D&O")

liability insurance policies insuring all of the directors and officers of Nanovation.

16.     The primary Directors, Officers and Private Company Liability

Insurance Policy was issued by National Union, Policy No. 473-64-81 (the

"Primary Policy"). *See* Exhibit C.  The Primary Policy was originally issued with a

term of October 8, 2000 to October 8, 2001 and contained a limit of liability of

$5,000,000.  On or about October 8, 2001, National Union extended the term of

the Primary Policy six months such that the policy remained in effect for eighteen

months from October 8, 2000 to April 8, 2002.

17.     National Union delivered its policy to Nanovation's executive and

corporate office at 2665 S. Bayshore Drive, Suite 501, Miami, Florida, 33133.

18.     On or about October 8, 2000, Federal issued the first layer excess

policy, Policy No. 8158-7833, with effective dates October 8, 2000 to October 8,

2001 (hereafter the "First Layer Excess Policy"). *See* Exhibit D.  The face

amount of Federal's First Layer Excess Policy was $10,000,000.

19.     Federal delivered its policy to Nanovation's executive and corporate

office at 2665 S. Bayshore Drive, Suite 501, Miami, Florida, 33133.

20.     On or about October 8, 2000, Twin City issued an Excess Financial

Products Policy, Policy No. NDA0159030, with effective dates October 8, 2000 to

7

October 8, 2001 (hereafter the "Second Layer Excess Policy").  *See* Exhibit E.

The face amount of Twin City's Second Layer Excess Policy was $5,000,000.

21.     Twin City delivered its policy to Nanovation's executive and

corporate office at 2665 S. Bayshore Drive, Suite 501, Miami, Florida, 33133.

22.     Nanovation's First Layer Excess Policy and Second Layer Excess

Policy were what are commonly known in the insurance industry as "following

form" policies, meaning the First Layer Excess Policy and the Second Layer

Excess Policy mirrored the terms and conditions of the Primary Policy.

23.     From its executive and corporate office in Florida, Nanovation's

Vice President of Finance and Treasurer, John Ofenloch Jr. ("Ofenloch"),

negotiated with each of the Insurer Defendants regarding their respective D&O

policies.

24.     The Primary Policy includes terms and conditions which provide

that National Union shall pay the loss of each and every director or officer of

Nanovation arising from any actual or alleged wrongful act in their respective

capacities as directors or officers of Nanovation, including defense costs:

**Front Page of Policy:  List of "Notices" prior to Declarations**

THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND.

HOWEVER, THE INSUREDS MAY UNDER CERTAIN CONDITIONS

TENDER THE DEFENSE OF A CLAIM.  <u>IN ALL EVENTS, THE INSURER</u>

<u>MUST ADVANCE DEFENSE COSTS PAYMENTS PURSUANT TO THE
TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.</u>

**Coverage A: Individual Insured Insurance**

This policy shall pay the Loss of each and every Director, Officer or
Employee of the Company arising from a Claim first made against such
Insureds during the Policy Period or the Discovery Period (if applicable)
and reported to the Insurer pursuant to the terms of this policy for any
actual or alleged Wrongful Act in their respective capacities as Directors,
Officers or Employees of the Company except when and to the extent that
the Company has indemnified such Insureds. <u>The Insurer shall, in
accordance with and subject to Clause 8, advance Defense Costs of such
Claim prior to its final disposition.</u>  *See* Exhibit C at 1.

25.     By virtue of the Primary Policy, the First Layer Excess Policy and
the Second Layer Excess Policy issued by National Union, Federal and Twin City
respectively and in light of their group violation of the Florida Notice Statute,
there was coverage for the defense of the Plaintiff of the Trustee's Complaint of
May 7, 2002.  The Insurer Defendants owed the Plaintiff a duty to advance and
provide the defense costs for the litigation against him described herein.

26.     The Trustee intimidated Insurer Defendants early on by injecting
hyperbole alongside his written Complaint for $20M plus in damages, alleging
various theories of corporate fraud by <u>all</u> of the directors and officers of

9

Nanovation and calling it "another Enron." The Insurer Defendants, led by National Union, simply assumed all directors and officers had committed this alleged fraud and from Day 1 the Insurer Defendants, as a group, conspired to refuse to provide for defense coverage for any defendant based on that simple belief, just as they previously had with numerous directors and officers of other Corporations who had purchased similar D&O policies from them, as part of a broad and longstanding "unwritten" claims training program internally and with insurance brokers like Marsh to deny, delay and defend any existence of coverage when even a hint of D&O fraud exists.

27.     Ironically, it was later learned through depositions that a certain subset of Nanovation directors had in fact committed securities fraud, back in the 1998-1999 timeframe, a period when the National Union Primary Policy was not yet in effect and Plaintiff was not yet employed with the firm. Yet National Union had the audacity to still settle claims on September 28, 2008 with this very D&O subset, knowing they had committed corporate securities fraud. *See* Exhibit F. Perhaps this should not be such a shocking revelation as National's parent company, AIG, has committed these very same acts of late by participating in fraudulent financial insurance instruments known as Credit Default Swaps ("CDSs"), the equivalent of selling insurance for the Titanic by someone on the Titanic, in one of the largest corporate financial scams in U.S. history.

10



## NANOVATION'S NOTICE OF CIRCUMSTANCES

28.     On July 25, 2001, after receiving the Notice of Circumstances letter

sent on July 23, 2001 by Ofenloch, Marsh's Dennis Love ("Love") sent letters

along with a copy of the Notice of Circumstances to Thomas Kopp, an assistant

vice president, and Lucy Anne Galioto, a complex claims director, at National

Union.  Love's letters advised National Union to "accept this as notice of

circumstances that may give rise to a claim under the above-captioned policy, as

well as any other applicable policies."  Love's letters further advised that National

Union should contact Ofenloch if it required any additional information.

29.     On that same date, Love sent letters to Chubb Group of Insurance

Companies ("Chubb"), the parent company of Federal, and to The Hartford, an

affiliate of Hartford Insurance Company, the corporate parent of Twin City, also

enclosing the Notice of Circumstances letter.

30.     On information and belief, on or before July 30, 2001, National

Union received the Notice of Circumstances Letter.  On information and belief, on

or before July 31, 2001, Federal received the Notice of Circumstances Letter.

On information and belief, on or before July 31, 2001, Twin City received the

Notice of Circumstances Letter.

31.     On August 10, 2001, Nancy Pease ("Pease") from Chubb (on

behalf of Federal) wrote Ofenloch acknowledging receipt of the Notice of

Circumstances Letter and advising that Federal was not able to issue a coverage

position at that time because National Union had not yet issued its coverage

11

opinion. On that same date, Pease wrote to National Union stating that "Denise [sic] Love of Marsh placed us on notice of the above potential claim involving our mutual insured." In her letter, Pease went to request a copy of National Union's coverage position.

32.    On August 17, 2001, Larry Fine ("Fine"), assistant vice president of AIG Technical Services, Inc. ("AIG"), the authorized claim handler for National Union, wrote Love acknowledging receipt of Love's July 25, 2001 correspondence and advising that Sylvia Toyos ("Toyos") was the claims director assigned to handle the matter. In his letter, Fine stated, "In the near future, Sylvia will issue a coverage opinion addressed to you."

33.    On October 18, 2001, pursuant to a request from Michael Morabito ("Morabito"), from Hartford Financial Products ("Hartford"), also an affiliate of Hartford Insurance Group, Marsh sent Morabito a copy of the reporting letter and National Union's policy.

34.    AIG's Toyos did not advise Marsh of AIG's preliminary determination of coverage with respect to the Notice of Circumstance Letter until October 29, 2001, more than 3 months after the Notice of Circumstance Letter was sent and after both the First Layer Excess Policy with Federal and the Second Layer Excess Policy with Twin City had expired. Toyos' letter advised that the Notice of Circumstance Letter did not constitute notice in accordance with Clause 7(c) of the National Union Primary Policy. Specifically, Toyos indicated that the Notice of Circumstances Letter did not set forth the

12

circumstances or reasons for anticipating a claim and did not provide full particulars as to dates, persons and entities involved.

35.    AIG never sent the October 29, 2001 Toyos letter to the Plaintiff or to Nanovation or to any of its directors and officers.

36.    National Union never sent the October 29, 2001 Toyos letter to the Plaintiff—its insured—or to Nanovation or to any of its directors and officers.

37.    Marsh never sent the October 29, 2001 Toyos letter to the Plaintiff or to Nanovation or to any of its directors and officers.

38.    At no time prior to October 29, 2001, did Toyos or anyone else from AIG or National Union contact the Plaintiff, Nanovation or Marsh to request any more particulars.  On information and belief, no one at AIG or National Union gathered information, investigated or spoke to anyone regarding the Notice of Circumstances Letter.

39.    The Plaintiff or any of the former directors of Nanovation would have supplied additional available information if any of the Insurer Defendants had requested it.

40.    On or about December 6, 2001, Marsh's Hugh Dennis ("Dennis") spoke with Toyos regarding her preliminary coverage opinion.  Toyos advised Dennis in that conversation that she could not advise him what would constitute sufficient notice.  Toyos advised Dennis that she would accept the Chapter 11

13

and Chapter 7 bankruptcy filings. Dennis provided Toyos with the website address to access those bankruptcy filings. At no time during that conversation did Toyos request any more particulars or ask for any additional information relating to the Notice of Circumstances Letter.

41.    Hartford's Morabito did not advise Marsh that the Notice of Circumstances Letter did not satisfy the specificity requirements of the National Union Primary Policy until February 12, 2002, more than 6 months after the Notice of Circumstances Letter was sent and after the Twin City Second Layer Excess Policy had expired. At no time prior to February 12, 2002, did Hartford or Twin City request any further particulars or any additional information from the Plaintiff, Nanovation, other directors or Marsh regarding the Notice of Circumstances Letter.

## NOTICE OF CLAIMS

42.    On May 7, 2002, Tom Yardley ("Yardley"), the Trustee's attorney, sent a notice of claim ("Notice of Claim Letter") and a copy of the Trustee's then filed Adversary Complaint to Marsh and National Union. Marsh then forwarded this Notice of Claim Letter to both Chubb and Hartford on May 9, 2002.

43.    On May 14, 2002, Morabito, on behalf of Twin City, issued his coverage declination letter to Marsh in response to Yardley's Notice of Claim Letter.

14

44.     Between May 14, 2002 and July 31, 2002, Plaintiff sent notices to Marsh, National Union and Chubb stating that he believed a claim would be brought against him.

45.     On information and belief, on May 23, 2002, Chubb's Pease again requested a copy of Toyos' October 29, 2001 preliminary coverage opinion regarding the Notice of Circumstances Letter.  On June 3, 2002, Pease sent a follow-up letter to Toyos requesting a copy of Toyos' October 29, 2001 preliminary coverage opinion.  On June 11, 2002, Pease left another message for Toyos requesting a copy of her preliminary coverage opinion.  On information and belief, Toyos never sent Pease a copy of her preliminary coverage opinion.

46.     On June 12, 2002, David Mahaffey ("Mahaffey") from AIG sent Pease Toyos' October 29, 2001 preliminary coverage opinion.

47.     Pease, on behalf of Federal, did not advise Marsh that the Notice of Circumstances Letter was not accepted as a notice of potential claim, until June 14, 2002, almost 11 months after the Notice of Circumstances Letter was sent and 8 months after the Federal First Layer Excess Policy expired.

48.     On July 26, 2002, AIG, on behalf of National Union, declined coverage of the Plaintiff's, Trustee's and various other directors' and officers' claims on the basis that their notices of claims were not timely.

49.     When it declined coverage of the Trustee's Complaint based on the various notices of claims it had received through July, 2002, National Union (and

15

AIG) had yet to advise the Plaintiff or Nanovation that the Notice of Circumstances Letter sent over a year earlier on July 23, 2001 was insufficient.

50.    Plaintiff tendered the defense of the Trustee's Complaint to the Insurer Defendants who refused to accept and provide for the Plaintiff's defense.

51.    AIG never advised the Plaintiff or Nanovation that the Notice of Circumstances Letter was insufficient.  The Plaintiff and Nanovation were never given an opportunity to cure any deficiencies in the Notice of Circumstances Letter prior to the Primary Policy, First Layer Excess Policy and Second Layer Excess Policy all expiring.

52.    Similarly, Chubb and Hartford did not advise the Plaintiff or Nanovation that the Notice of Circumstances Letter was insufficient until well after both the First Layer Excess Policy and Second Layer Excess Policy had expired.

## V.

## GENERAL RICO AVERMENTS

### A. THE ENTERPRISE

53.    Plaintiff is informed and believes and based thereon alleges that an enterprise existed such that Defendant Marsh, along with Defendants National, Federal and Twin City associated together for the common purpose and intent of defrauding Plaintiff of insurance benefits of up to $20,000,000.

16

54.     On information and belief, various emails, meeting/conference call notes and documents with "internal only" annotations exist from the Jul 23, 2001 through Dec 31, 2003 period, evidence that the Insurer Defendants were, in fact, only "going through the motions" of claims processing and had already discussed individually, and as a group, that they were not going to "pay for any fraud" that would impact their (and executives) annual performance and incentive bonus plan payouts including cash, stock options and restricted stock.

## B. PATTERN OF RACKETEERING

55.     On information and belief, various emails, meeting/conference call notes and documents with "internal only" annotations exist from 1999 through 2008, evidence that the Insurer Defendants have consistently denied, delayed and defended similar D&O policy claims from other corporate executives who were initially accused of fraud, proclaiming internally that they were not going to "pay for any fraud" that would impact their (and executives) annual performance and incentive bonus plan payouts including cash, stock options and restricted stock.

56.     A longstanding "unwritten" claims training program exists internally at AIG, Hartford and Chubb and with their insurance brokers like Marsh to deny, delay and disavow any existence of coverage when even a hint of D&O fraud exists.

17

## C. RICO OFFENSES

57.     As alleged with particularity above, Defendants and each of them are associated with the enterprise, and conducted or participated in the enterprise's affairs through a pattern of racketeering in violation of 18 U.S.C. § 1962 (c) or (d).

58.     As alleged with particularity above, Defendants and each of them conspired with the other defendants to violate the provisions of 18 U.S.C. § 1962 (c) or (d).

59.     As alleged with particularity above, due to the concealment by Defendants and each of them, regarding their longstanding "unwritten" claims training program internally and with insurance brokers like Marsh to deny, delay and defend any existence of coverage when even a hint of D&O fraud exists, Plaintiff continues to discover and incur injuries on an ongoing basis.

## D. PREDICATE OFFENSES

### (1) Mail Fraud

60.     As alleged with particularity above, Defendants and each of them devised or intended to devise a scheme or artifice to defraud Plaintiff (and 10 other Nanovation Technologies Inc. Directors), and in doing so used the U.S. Mail and/or other private carriers to divest Plaintiff of coverage benefits.

### (2) Wire Fraud

61.    As alleged with particularity above, Defendants and each of them devised or intended to devise a scheme or artifice to defraud Plaintiff (and 10 other Directors and Officers of Nanovation Technologies Inc.), and in doing so used the interstate telephone and telefax lines, cellular phones and internet transmission to divest Plaintiff of coverage benefits.

### (3) Obstruction of Justice

62.    As alleged with particularity above, in carrying out the scheme or artifice to defraud, Defendants and each of them corruptly influenced, obstructed or impeded, or endeavored to corruptly influence, obstruct or impede the due administration of justice.  Throughout the racketeering activity, the Defendants and each of them new from a legal standpoint that Plaintiff was covered under the Primary Policy, First Layer Excess Policy and Second Layer Excess Policy.  By engaging in the racketeering activity, Defendants and each of them endeavored to corruptly influence, obstruct or impede the due administration of justice.

### VI.

### CLAIMS FOR RELIEF

63.    Plaintiff re-alleges the text and content of each paragraph appearing anywhere in this Complaint.

19



## FIRST CLAIM FOR RELIEF

### CIVIL RICO 18 U.S.C. § 1962 (c) *et. seq.*

64.     As alleged with particularity above, Defendants and each of them worked together and in concert to create and carry on an enterprise engaged in racketeering activities.

65.     As alleged with particularity above, the facts demonstrate that Defendants and each of them unlawfully, willfully and knowingly performed acts or emissions and conducted or participated, directly or indirectly, in the conduct of Defendants affairs through the means of a pattern of racketeering activities.

66.     As alleged with particularity above, as a direct and proximate result of the aforementioned RICO conduct, the Plaintiff was defrauded out of a substantial amount of coverage benefits, in an amount presently ascertained to be $600,000.00.  Plaintiff reserves the right to amend this Complaint when an exact amount becomes knowable.

67.     As alleged with particularity above, Defendants are liable to Plaintiff for treble damages, together with all costs of this action, plus reasonable attorney fees as provided by 18 U.S.C. § 1964.

68.     To the extent permitted by law, Plaintiff is entitled to extra-contractual, exemplary and punitive damages, plus court costs, and pre and post-judgment interest at the at the legally allowable limit.



## <u>SECOND CLAIM FOR RELIEF</u>

### CIVIL RICO CONSPIRACY 18 U.S.C. § 1962 (c) *et. seq.*

69.    As alleged with particularity above, Defendants and each of them worked together and in concert to create and carry on an enterprise engaged in racketeering activities.

70.    As alleged with particularity above, the facts demonstrate that Defendants and each of them unlawfully, willfully and knowingly performed acts or emissions and conducted or participated, directly or indirectly, in the conduct of Defendants affairs through the means of a pattern of racketeering activities.

71.    As alleged with particularity above, as a direct and proximate result of the aforementioned RICO conduct, the Plaintiff was defrauded out of a substantial amount of coverage benefits, in an amount presently ascertained to be $600,000.00.  Plaintiff reserves the right to amend this Complaint when an exact amount becomes knowable.

72.    As alleged with particularity above, Defendants are liable to Plaintiff for treble damages, together with all costs of this action, plus reasonable attorney fees as provided by 18 U.S.C. § 1964.

73.    To the extent permitted by law, Plaintiff is entitled to extra-contractual, exemplary and punitive damages, plus court costs, and pre and post-judgment interest at the legally allowable limit.

21

## THIRD CLAIM FOR RELIEF

### VIOLATION OF "FLORIDA NOTICE STATUTE"

74.     Plaintiff re-alleges the text and content of each paragraph appearing anywhere in this Complaint.

75.     By taking the position that the Ofenloch Letter was not sufficient to satisfy the notice requirement in Clause/Section 7 of the Primary Policy, the Insurer Defendants violated Fla. Stat. § 627.426(2)(a) ("Florida Notice Statute") by asserting a "coverage defense." The Florida Notice Statute provides the following:

> (2) A liability insurer shall not be permitted to deny coverage based on a particular coverage defense unless:
>
> (a) Within 30 days after the liability insurer knew or should have known of the coverage defense, written notice of reservation of rights to assert a coverage defense is given to the named insured by registered or certified mail sent to the last known address of the insured or by hand delivery.

Insurer Defendants National Union, Federal and Twin City, each with willful intent, failed to properly provide such notice.

76.     As alleged above and as a direct and proximate result of the aforementioned conduct, the Plaintiff was defrauded out of a substantial amount of coverage benefits, in an amount presently ascertained to be $600,000.00. Plaintiff reserves the right to amend this Complaint when an exact amount becomes knowable.

## FOURTH CLAIM FOR RELIEF

### FRAUD, MISREPRESENTATION AND DECEIT

77.     As alleged with particularity above, Defendants and each of them

made multiple verbal and written representations to Plaintiff regarding the

investigation and claim handling over a 6 yr period.

78.     The representations were material in nature and false, and included

among others, representations concerning the investigation, claim handling

and supposed merits of Plaintiff's D&O coverage claim.  Such representations

were deceitful and perpetrated as part of a covert plan or scheme contrived by

Insurer Defendants to divest Plaintiff of coverage benefits.

79.     Defendants and each of them knew the multiple verbal and written,

false and material representations were false.

## FIFTH CLAIM FOR RELIEF

### BAD FAITH

80.     Plaintiff re-alleges the text and content of each paragraph

appearing anywhere in this Complaint.

81.     Plaintiff's D&O Primary Policy No. 473-64-81 was at all times and in

all respects subject to a covenant of good faith and fair dealing.  As such,

Plaintiff was entitled to have his claim individually investigated for its merits of

immediate legal defense coverage beginning in 2002 through 2007.

82.     Under FLORIDA law, an insurer's duty to an insured under a first party contract imposes a non-delegable obligation to make a prompt, thorough and reasonable investigation of the merits of a submitted claim. The Defendants' duty imposes an obligation to individually investigate Plaintiff's claim with the interests of the insured equally in mind.

83.     Plaintiff, in entering into a primary contract for D&O insurance with AIG's National Union and brokered by the Marsh & McLennan Companies, purchased a D&O policy of insurance and not a forced self-represented 6 yr court battle from 2002 through 2007.

84.     Defendant National Union had a duty, and a continuing duty, to provide for and advance legal defense costs for Plaintiff instead of forcing Plaintiff to defend himself while enduring lengthy and psychologically stressful litigation for 6 yrs.

85.     Defendants and each of them breached and willfully violated the duty of good faith and fair dealing owed to Plaintiff which among other things required that Defendants be honest in dealing with Plaintiff's individual claim to provide for legal defense coverage.

86.     As alleged above, the Insurer Defendants acted unfairly, dishonestly and with deceit towards its insured – the Plaintiff.

## SIXTH CLAIM FOR RELIEF

### BREACH OF CONTRACT

87.    Plaintiff re-alleges the text and content of each paragraph appearing anywhere in this Complaint.

88.    At all times relevant to this action, Defendant National Union owed to the Plaintiff non-delegable, express and implied duties under the Primary Policy and other similarly worded policy forms marketed, underwritten, sold, issued and delivered to the Plaintiff by National Union and brokered by the Marsh & McLennan Companies.

89.    The Defendant National Union breached non-delegable, express and implied duties owed to the Plaintiff as a policyholder, claimant and insured under the subject policies, by, *inter alia*, repeatedly denying Plaintiff's (along with 10 other Nanovation Technologies Inc. Directors and Officers) claim to provide for legal defense coverage benefits for 6 yrs.

90.    The Defendant's breach of the non-delegable, express and implied duties owed to the Plaintiff as a policyholder, claimant and insured under the subject policies was a direct and proximate cause of actual damages sustained by Plaintiff.

## <u>SEVENTH CLAIM FOR RELIEF</u>

**NEGLIGENCE AND GROSS NEGLIGENCE**

91.     At all times relevant to this action, the Defendants and each of them owed to the Plaintiff non-delegable, express and implied duties to exercise reasonable care.

92.     The Defendants and each of them were negligent and grossly negligent, and breached non-delegable, express and implied duties owed to the Plaintiff, non-exclusive particulars, *inter alia*:

(a) failing to conduct a prompt, fair, thorough investigation of the Plaintiff's insured legal defense coverage claim;

(b) failing to voluntarily advance costs for Plaintiff's legal defense coverage caused by willful negligence;

(c) failing to make a realistic and on-going evaluation of Plaintiff's legal defense coverage claim over a 6 yr period from 2002-2007;

(d) divesting the Plaintiff of the use and benefit of coverage benefits owing under the 3 subject policies for legal defense coverage proximately caused by willful negligence;

(f) after the legal defense coverage need was timely reported and throughout a 6 yr period, relying without legitimate or arguable reasons, on

26

ambiguous, self-contradictory and invalid provisions to wrongly deny Plaintiff immediate and on-going legal defense coverage benefits due and owing; and,

(g) while under a continuing duty to voluntarily and promptly pay for and provide Plaintiff's legal defense coverage, and after knowing invalid, false and fabricated reasons were given for denial, refusing to promptly pay for and provide for Plaintiff's legal defense coverage over a 6 yr period.

## ACTUAL DAMAGES

93.    As a result of the Defendants breach of aforesaid duties and acts and omissions as alleged with particularity above, and set forth in the preceding Claims for Relief, Plaintiff is entitled to a judgment against the Defendants jointly and severally, for actual, compensatory and consequential damages, plus court costs, litigation expenses, and pre and post-judgment interest at the legally allowable limit.

## SPECIAL DAMAGES

94.    At all times relevant to this action, the Defendants and each of them owed to the Plaintiff non-delegable, express and implied duties to exercise reasonable care. As a result of this lack of care, special injury and damages have occurred to Plaintiff's name, business reputation and professional career causing irreversible personal and financial harm to the Plaintiff including permanent unemployment, anxiety, emotional distress and loss of spouse. Numerous parties including executive recruiters and hiring companies

themselves have refused to offer Plaintiff employment opportunities since

January 2004 and as recently as mid-2007 due to, as one party said, "no other

reason but for the simple <u>nature and existence</u> of a multi-year lawsuit against

you in your role as CEO and Director of Nanovation Technologies, Inc.--we just

can't take any chance in today's environment." Illinois Bankruptcy Judge

Pamela Hollis also agrees as seen in her final comments (*See* Exhibit A,

Excerpt Page 33) during the October 16, 2007 D&O dismissal hearing saying "I

did not think these lawsuits should have been brought" and "I think it was

probably injurious to their (D&Os) reputations." Special Damages are in an

amount presently ascertained to be over $22,000,000.00 representing

Plaintiff's lost future employment earnings potential through age 67. Plaintiff

reserves the right to amend this Complaint when an exact amount becomes

knowable.

95.    Plaintiff suffered damages as a result of Defendants failure to

provide and pay for legal defense coverage all of which caused adverse harm

to the Plaintiff as insured, along with anxiety and emotional distress which

would ordinarily follow such failure to pay. As a result, Plaintiff has also been

forced to incur additional inconvenience and expense.

96.    As a result of the Defendants acts and omissions, as detailed and

set forth in the Complaint, Plaintiff is entitled to a judgment against the

Defendants jointly and severally, for actual, compensatory and consequential

damages due to anxiety and emotional distress and additional inconvenience

28

and expense, and attorneys' fees resulting from National Union's breach of contract under Plaintiff's D&O Primary Policy No. 473-64-81 and the necessity of filing suit to recover coverage benefits voluntarily due and owing.

### TREBLE DAMAGES UNDER RICO

97.     As alleged with particularity above, Defendants and each of them are liable to Plaintiff for treble damages, together with all costs of this action, plus reasonable attorney fees as provided by 18 U.S.C. § 1964.

### ATTORNEYS FEES, LITIGATION EXPENSES AND COURT COSTS

98.     As a result of the Defendants breach of aforesaid duties, and acts and omissions, as alleged with particularity above in the preceding Claims for Relief, Plaintiff is entitled to a judgment against the Defendants jointly and severally for an award of attorneys fees, litigation expenses and court costs, plus pre and post-judgment interest at the legally allowable limit.

### EXTRA-CONTRACTUAL, EXEMPLARY AND PUNITIVE DAMAGES

99.     As a result of the Defendants breach of aforesaid duties, and acts and omissions, as alleged with particularity above in the preceding Claims for Relief, Plaintiff is entitled to a judgment against the Defendants jointly and severally for extra-contractual, exemplary and punitive damages, under common law, plus court costs, and pre and post-judgment interest at the legally allowable limit.

WHEREFORE, PREMISES CONSIDERED, Plaintiff brings this action and demands judgment of and from the Defendants jointly and severally, for actual, compensatory, and consequential damages; for attorneys fees, litigation expenses, court costs; and for extra-contractual, exemplary and punitive damages, plus pre and post-judgment interest at the legally allowable limit, in an amount within or exceeding this Court's jurisdictional limits.  Plaintiff demands judgment for extra-contractual, exemplary and punitive damages against the Defendants in an amount sufficient to deter and punish the Defendants from similar future conduct.

Respectfully submitted this the _12^TH_ day of _Nov_, 2008.

By: _Robt S. Chaney_

Robert S. Chaney, Plaintiff
2300 Holcomb Bridge Rd, Suite 103
Roswell, GA 30076
(404) 432-1805
Bchaney30@hotmail.com